## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEXEI ORLOV,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0350 (JDB)** |
| **PHYLLIS A. HOWARD, et al.** | ) |
| **U.S. Citizenship and Immigration Services** | ) |
| | ) |
| **Defendants.** | ) |

### DEFENDANTS' MOTION TO DISMISS

Defendants, by and through their attorney, the United States Attorney for the District of Columbia, respectfully move this Court, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), to dismiss this case for lack of jurisdiction and for failure to state a claim upon which relief can be granted. In support of this Motion, Defendants refer the Court to the accompanying Memorandum of Points and Authorities.  A proposed Order consistent with this Motion is also attached.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
202-305-1334

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALEXEI ORLOV,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0350 (JDB)** |
| **PHYLLIS A. HOWARD, et al.** | ) |
| **U.S. Citizenship and Immigration Services** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO DISMISS

Defendants, Phyllis Howard, District Director, U.S. Citizenship and Immigration Services, Michael Chertoff, Secretary, U.S. Department of Homeland Security, Emilio T. Gonzalez, Director, U.S. Citizenship and Immigration Services, Robert S. Mueller, Director, Federal Bureau of Investigation, respectfully request that this Court, dismiss the Verified Complaint for Mandamus and Declaratory Judgment filed by the Plaintiff in the above-captioned matter.

### I.    FACTUAL BACKGROUND

Plaintiff, Alexei G. Orlov, a citizen of the Russian Federation, was born in Moscow, Russia (then U.S.S.R.) on December 4, 1972.  See Complaint at ¶ 8.  Plaintiff now resides in Christiansburg, Virginia with his wife, a citizen of the United States.  see id.  On February 27, 2003, Mr. Orlov, filed his form I-485, which is an Application to Register Permanent Residence or Adjust Status (AOS application).[1]  See Declaration of Susan P. Dibbins (Dibbins' Decl.), Field Office Director of the Washington District Office of the United States Citizenship and

---

[1]This application is required in order to acquire a Permanent Resident Card or "Green Card."

Immigration Services (USCIS) in the Department of Homeland Security (DHS), ¶ 6.  An interview on the form I-485 application was scheduled for July 28, 2005.  Id.  A request for additional documents was also mailed to the applicant on July 21, 2005, with a deadline for submission of August 20, 2005. Id. The documents were received by USCIS, and are postmarked July 26, 2005.  Id.  The applicant's adjustment application is based upon a form I-130, petition for alien relative, which was filed on his behalf by his United States Citizen wife at the same time as the form I-485, on February 27, 2003.  The form I-130 was approved at the Washington District Office of USCIS on September 7, 2005.  Dibbins' Decl. ¶ 7.

When an alien applies for adjustment of status, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for the benefit and that he is not a risk to national security or public safety.  In addition to record checks against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.[2]  No immigration benefit (e.g., adjustment of status, naturalization/U.S. citizenship) is granted unless and until all the above-required background checks have been completed and resolved.  Dibbins Decl. ¶ 1.

These law enforcement checks can reveal significant derogatory information concerning

---

[2]  IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity.

2

alien applicants for immigration benefits, including applicants seeking adjustment of status. Such checks have resulted in alien applicants being found ineligible for the benefit sought, and in the USCIS's denial of the application. In some instances, the disqualifying information concerning the alien has been discovered as a result of the IBIS or FBI name checks, when it had not been revealed by a fingerprint check alone. Dibbins' Decl. ¶ 2. Although an alien's file may show that an FBI fingerprint check was performed, the fingerprint checks frequently do not reveal the types of derogatory information described above, particularly when it is not information that has resulted in an arrest or criminal conviction. For example, persons on a "watch list" who are suspected of terrorist activity will not necessarily be identified through an FBI fingerprint check, but could be identified through an IBIS record check or an FBI name check of investigation databases. Dibbins' Decl. ¶ 4.[3] It would be unconscionable and potentially risk the safety and security of the nation for USCIS to grant United States lawful permanent resident status to anyone without first ensuring that the government's law enforcement databases do not contain verified derogatory information about the alien. Dibbins' Decl. ¶ 5.

USCIS commenced the mandatory criminal and national security background checks, including the FBI name check in May of 2003, in particular the FBI name checks were initiated

---

[3] FBI fingerprint checks of Mr. Orlov were submitted to the FBI on May 7, 2003. USCIS received the results of that fingerprint check from the FBI on May 8, 2003. These fingerprint checks expired on August 8, 2004, and a second set of fingerprints was submitted to the FBI on December 14, 2004. The second set of fingerprints expired on March 14, 2006. A third set of fingerprints was processed by the FBI on March 1, 2006 and are set to expire on June 1, 2007. In the event this case is not completed by June 1, 2007, a new fingerprint notice will be mailed to the applicant to once again update his fingerprints to be current to within 15 months.

on Mr. Orlov on or around May 5, 2003.[4]  Adjudication of a properly filed I-485 application to

adjust status lies with the USCIS district director having jurisdiction over the alien's place of

residence.  See 8 CFR § 245.2(a).  USCIS has been unable to complete adjudication of the

adjustment status application because the mandatory FBI name check remains pending as of the

date of the attached declaration.  Dibbins' Decl. ¶ 8; Declaration of Michael A. Cannon (Cannon

Decl.), Section Chief, National Name Check Program Section of the FBI, ¶ 22.

The FBI name check process is detailed and set forth in the Declaration of Michael A.

Cannon, ¶¶ 4, 16, 17 - 22.  The fact is that although the vast majority clear quickly, FBI name

checks can remain pending on applicants for longer periods of time, but such delays involve only

approximately one percent of the USCIS applications received each year.  Cannon Decl. ¶¶13 -

15. The FBI's processing of 440,000 re-submissions from the former Immigration and

Naturalization Service (INS) has delayed the processing of regular submissions from USCIS.

Cannon Decl. ¶ 19.   The FBI processes name check requests on a "first-in, first-out" basis

unless USCIS directs that a particular name check be expedited.[5]  Id.

---

[4]  The FBI received the name check request for Mr. Orlov on or about May 8, 2003.
Declaration of Michael A. Cannon, Section Chief, National Name Check Program Section,
Records Management Division, FBI ¶ 22.

[5]  USCIS has not filed a request with the FBI to expedite the name check in this particular case.
Such expedited requests require additional fees to be paid to the FBI by USCIS and USCIS is
limited by the FBI as to the number of requests that can be made.  Therefore, such requests are
only made in exceptional circumstances.  On February 20, 2007 USCIS posted a clarification of
the criteria used to expedite FBI name checks on its public website.  This clarification made
clear that pending litigation was removed as the sole basis to support an expedite request.
USCIS may continue to request an expedited FBI name check for a case in litigation if it meets
one of several other approved criteria, including, but not limited to: (1.)  Military deployment;
(2.)  Age-out cases not covered under the Child Status Protection Act, and applications affected
by sunset provisions such as diversity visas; (3.)  Significant and compelling reasons, such as
critical medical conditions, and (4.) Loss of social security benefits or other subsistence at the
discretion of the USCIS District Director.  Dibbins' Decl. ¶ 8.

The FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS.  Id., at ¶ 20.  The processing of name checks, including those which are expedited, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name checks; the volume of priority checks the analyst must process; the number of hits that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks.  Id.  While the FBI is sensitive to the impact of the delays in processing name requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results.  When the name check is completed, the FBI provides the results to USCIS as quickly as possible.  Id.

USCIS is mandated to perform and await favorable completion of the national security FBI name check, and is mandated to have all background checks current and favorably resolved prior to approval of any application.  Cannon Decl. ¶ 21; see also Public Law 103-317, 108 Stat. 1724, Aug. 26, 1994.

Once USCIS receives the FBI name check clearance, assuming the name check clears with no possibly derogatory information, USCIS will also be required to ensure that Plaintiff's fingerprint results have not expired, prior to approving the application for adjustment of status or issuing a lawful permanent resident card.  Dibbins' Decl. ¶ 9.  If, however, USCIS receives any derogatory information as a result of the FBI name check, USCIS is mandated to investigate and resolve that derogatory information prior to completion of the application adjudication. Dibbbins' Decl. ¶ 3.

Since the terrorist attacks of September 11, 2001, the need to conduct more rigorous and

thorough background checks on aliens who are seeking immigration benefits has required procedures that sometimes result in individuals not receiving a response to their application as quickly as in the past. Cannon Decl. ¶ 16-17. However, the law and public safety requires USCIS to make certain that the checks have been done before it adjudicates and approves an application to ensure the applicant's eligibility for the benefit. Dibbins' Decl. ¶ 5.

On February 15, 2007, Plaintiff filed the instant Complaint for Mandamus relief against Defendants, seeking to compel Defendants to adjudicate Plaintiff's application for lawful permanent residence. See Complaint at ¶ 1. As Defendants demonstrate below, the Complaint should be dismissed because this Court lacks subject matter jurisdiction, and because the Complaint fails to state a claim upon which relief may be granted.

## II.    STANDARD OF REVIEW FOR MOTION TO DISMISS

The standard to be applied in deciding a motion to dismiss is well-established. For purposes of deciding whether a Plaintiff has failed to state a cause of action, the factual allegations of the complaint must be taken as true, and all ambiguities or doubts in the factual allegations must be resolved in favor of the pleader. Caudle v. Thomason, 942 F.Supp. 635, 638 (D. D.C. 1996). Despite this generous standard, the complaint still must set forth sufficient factual information to suggest that there exists some recognized legal theory upon which relief can be granted. Id. A court must dismiss a complaint where, even assuming all the factual allegations are true, Plaintiff has failed to establish a right to relief based upon those facts. Id.

The Plaintiff bears the burden of establishing the court's subject matter jurisdiction. See Miller v. United States, 710 F.2d 656, 662 (10th Cir.), cert. denied, 464 U.S. 939 (1983); Baird v. United States, 653 F.2d 437, 440 (10th Cir. 1981), cert. denied, 454 U.S. 1144 (1982). In deciding a motion under Rule 12(b)(1), the Court may go beyond the allegations of the

Complaint.  See Land v. Dollar, 330 U.S. 731, 735 n. 4 (1947); Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197-98 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Bonterra America, Inc. v. Bestmann, 907 F.Supp. 4, 5 n.1 (D.D.C. 1995); Kuffel v. United States Bureau of Prisons, 882 F. Supp. 1116, 1120 (D.D.C. 1995).  Additionally, a court may properly take judicial notice of court records without converting a motion to dismiss into a motion for summary judgment.  E.g., Baker v. Henderson, 150 F.Supp.2d 17, 19 n. 1 (D.D.C. 2001) (""in determining whether a complaint fails to state a claim, the court may take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment.");  Himmelman v. MCI Comm., 104 F.Supp.2d 1, 3 (D.D.C. 2000) ("[t]he court may consider [on a motion to dismiss] the allegations of the complaint, documents attached to or specifically referred to in the complaint, and matters of public record.").  This is so because a motion under Rule 12(b)(1) "calls into question the court's power to hear the plaintiff's claim ... and therefore imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power."  5A Wright & Miller, Federal Practice & Procedure 2d § 1350; see also District of Columbia Retirement Bd. v. United States, 657 F.Supp. 428, 431 (D.D.C.1987).  Accordingly, the Court need not limit itself to the allegations of the Complaint in deciding a 12(b)(1) motion.  Instead, "the Court may consider the complaint supplemented by undisputed facts evidenced in the record ... plus the court's resolution of disputed facts."  Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir.1992).

A motion to dismiss under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In making determinations on a

motion to dismiss under Rule 12(b)(6), a court must view facts alleged in the complaint in the light most favorable to the plaintiff. Id.; see also Nix v. Hoke, 139 F.Supp.2d 125, 131 (D.D.C. April 2001) (citing, Weyrich v. The New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001)), and Slaby v. Fairbridge, 3 F. Supp. 2d 22, 27 (D.D.C. 1998). In this case, Plaintiff fails to establish a right to relief on the claims asserted, even when accepting the facts he alleges as true.

## III.    ARGUMENT

### A.    Applications For Adjustment Of Status

Section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255, authorizes USCIS to adjust to permanent residence status certain aliens who have been admitted into the United States. Adjustment of status is subject to a favorable exercise of discretion. Section 245(a) provides:

> The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time of his application.

8 U.S.C. § 1255(a) (emphasis added). Significantly, the statute does not set forth any time frame in which a determination must be made whether to adjust an alien's status.

The procedures for admitted aliens to apply for adjustment of status are set forth at 8 C.F.R. § 245. Jurisdiction over an application for adjustment of status lies in the USCIS district where the applicant resides. See 8 C.F.R. § 245.2(a). The regulations do not establish any time frame in which adjudication must occur. Before a decision is rendered on an alien's I-485 application, USCIS, in conjunction with the Federal Bureau of Investigation, conducts several

8

forms of security and background checks to ensure that the alien is eligible for the benefit and that he or she is not a risk to national security or public safety.  These checks currently include: (a) records checks against the Department of Homeland Security's ("DHS") own immigration systems; (b) an FBI fingerprint check for relevant criminal history records on the alien; (c) a check against the Interagency Border Inspection System ("IBIS"), which is managed by DHS, and contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (d) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.  Dibbins' Decl. ¶ 1; see also 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States").

### B.     Plaintiff's Claim Is Barred

Plaintiff contends that subject matter jurisdiction exists in this action under 28 U.S.C. §§ 1331, 1361, and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 555(b) and 702.  See Complaint at ¶¶ 3 -4.  Defendant disagrees.  The cited statutory provisions fail to provide a basis for subject matter jurisdiction over Plaintiff's claim.  Specifically, the Court lacks subject matter jurisdiction because:

(1) The INA divests courts of jurisdiction over suits where, as here, the Plaintiff seeks judicial review of either an agency's discretionary decision or action, INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

(2)  Mandamus is a remedy, once jurisdiction is properly invoked, not a basis for

9

jurisdiction.  Further, mandamus may not issue here because the Plaintiff lacks a clear right to an immediate adjudication of the application to adjust status, and Defendant owes no clear duty to adjudicate the adjustment application prior to the completion of background checks for criminal convictions, immigration fraud, and national security matters.

(3) The Administrative Procedure Act does not provide an independent basis for subject matter jurisdiction to review agency action, but its waiver of sovereign immunity must be coupled with another basis for jurisdiction, such as 28 U.S.C. § 1331.  Further, the APA precludes judicial review of agency's discretionary decisions.

**E.    Plaintiff's Complaint Should Be Dismissed Under Rule 12(b)(1) because INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii), and INA § 242(g), 8 U.S.C. § 1252(g), Each Independently Divest this Court of Jurisdiction.**

1.    <u>INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii)</u>.

The INA contains an express jurisdiction-stripping provision where a litigant seeks review of an adjustment case or any other discretionary decision. In a subsection entitled "Matters not subject to judicial review," INA § 242(a)(2)(B) provides that:

> Notwithstanding any other provision of law (statutory or nonstatutory), section 2241 of title 28, United States Code, . . . and sections 1361 and 1641 of such title, and . . . regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review:
>
> (I)    any judgment regarding the granting of relief under section 212(h), 212(I), 240A, 240B, or 245 [8 U.S.C. § 1255], or
> (ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be <u>in the discretion of the Attorney General or the Secretary of Homeland Security</u>, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added).  <u>See</u> <u>Zhu v. Gonzales</u>, 411 F.3d 292 (D.C. Cir 2005); <u>Jeafarquomi v. Gonzales,</u> Civ. Act. No. 07-0019 (E.D. Va. April 30, 2007); <u>Dmitrenko v.</u>

Chertoff, 2007 WL 1303009 (E.D. Va. April 30, 2007); Mustafa v. Pasquerell, 2006 WL 488399

(W.D. Tex. Jan 10, 2006); Zahini v. Neufeld, 2006 WL 2246211 (M.D. Fla. June 26, 2006);

Blacher v. Ridge, 436 F. Supp.2d 602 (S.D.N.Y. 2006).

Because the adjudication of an adjustment of status application is expressly committed to

the discretion of the Secretary of Homeland Security, 8 U.S.C. § 1252(a)(2)(B)(ii) divests this

Court of subject matter jurisdiction.  Under 8 U.S.C. § 1252(a)(2)(B)(ii), courts are barred from

reviewing any "decision or action" the authority for which is specified as discretionary under

"this title."  In seeking to compel the adjudication of an adjustment of status application under 8

U.S.C. § 1255, Plaintiff's claim falls squarely within the plain meaning of these terms.

First, "this title" refers to Title II of the INA, which is comprised of INA §§ 201 - 294, 8 U.S.C.

§§ 1151 through 1363a, i.e. all INA sections in the 200 series.  Thus, section 245(a), 8 U.S.C.

§1255(a), which grants discretionary authority to adjudicate adjustment of status applications, is

part of Subchapter II.

Second, under INA 245(a), 8 U.S.C. § 1255(a), the "authority" for adjudicating

adjustment of status applications is discretionary.  INA § 245(a), 8 U.S.C. § 1255(a) (emphasis

added), provides:

> The status of an alien who was inspected and admitted or paroled
> into the United States . . . may be adjusted by the Attorney
> General, in his discretion, and under such regulations as he may
> prescribe, to that of an alien lawfully admitted for permanent
> residence if (1) the alien makes an application for such adjustment,
> (2) the alien is eligible to receive an immigrant visa and is
> admissible to the United States for permanent residence, and (3) an
> immigrant visa is immediately available to him at the time his
> application is filed.

INA § 1255(a) "vests USCIS with discretion over the *entire* process of adjustment application

adjudication.  As such, § 1252(a)(2)(B)(ii) precludes judicial review of any 'action,' meaning

any act or series of acts, included within the ongoing adjudication process and the pace at which that action proceeds." Safadi v. Howard, 466 F.Supp.2d 696, 700 (E.D.Va. 2006)(emphasis in original) (nearly 4 years had passed in processing plaintiff's pending application for adjustment of status); accord Wilkinson-Okotie v. U.S. Dept. of Homeland Security, 2006 WL 2792405 at 3 (S.D. Tex. Sept. 26, 2006)("Discretionary decisions involving applications for adjustment of status under 8 U.S.C. § 1255 are expressly included within the jurisdiction-stripping provision found in § 1252(a)(2)(B)(I)."); Khalifa v. USCIS, 2006 WL 3609925 at 4 (M.D. Fla. Oct. 10, 2006)(the adjustment statute, 8 U.S.C. § 1255, "expressly places the adjustment of immigration status within the 'discretion' of the Attorney General.'").

The Supreme Court has also determined that "adjustment of status," through which an alien in the United States may apply for permanent resident status, "is a matter of grace, not right.…" Elkins v. Moreno, 435 U.S. 647, 667 (1978). See also Wallace v. Gonzales, 463 F.3d 135, 136 (2nd Cir. 2006). Absent "adverse factors, adjustment will ordinarily be granted, still as a matter of discretion." Elkins v. Moreno, at 667 (quoting Matter of Arai, 13 I. & N. Dec. 494, 496 (1970)) (emphasis altered). See also, Daud v. Gonzales, 2006 WL 347712 at 8 (3rd Cir. Dec. 5, 2006) ("The decision to grant or deny an adjustment of status pursuant to § 1255 is a discretionary one . . . [t]herefore we are without jurisdiction to review Daud's challenge to the BIA's denial of discretionary relief . . .").

Plaintiff is also seeking judicial review of both an agency decision and agency action. USCIS has made a decision that it cannot immediately adjudicate Plaintiff's application because the background checks are incomplete, and has acted to withhold adjudication of the adjustment application until these checks have cleared. Dibbins' Decl. ¶¶11 - 12. The Safadi Court stated that "under § 1252(a)(2)(B)(ii) the term 'action' encompasses *any* act or series of acts that are

12

discretionary within the adjustment of status process." 466 F.Supp.2d at 699 (emphasis in

original). Since "§ 1255(a) does not impose any limits on USCIS's discretionary authority over

the adjustment of status process, it is clear that 'action' in § 1252(a)(2)(B)(ii) encompasses the

entire process of reviewing an adjustment application, including the completion of background

and security checks and the pace at which the process proceeds." Id. The pertinent regulations

support the USCIS's discretionary decision to withhold adjudication until the completion of the

necessary background checks, to ensure the alien's eligibility for adjustment of status or other

immigration benefit. 8 C.F.R. § 103.2(b)(7); 8 C.F.R. § 103.2(b)(18). See Zahani v. Neufeld,

2006 WL 2246211 at 2 (M.D. Fla. June 26, 2006) (8 C.F.R. § 103.2(b)(18) "provides USCIS

with discretion to withhold adjudication of the adjustment of status application."); Khalifa v.

USCIS, 2006 WL 3609925 at 4 (M.D. Fla. Oct. 10, 2006)("USCIS' authority under 8 C.F.R. §

103.2(b)(18) "to withhold adjudication is a decision solely within the discretion of USCIS.").

The regulations clearly afford "wide discretion to [USCIS] in matters pertaining to the

timing of the adjudication of petitions." Mustafa v. Pasquerell, 2006 WL 488399, *4 (W.D. Tex.

2006) citing, Willis-Gomez v. Meissner, 879 F.Supp. 1120, 1123-24 (W.D. Okla. 1995). The

investigative process employed for adjustment of status applicants involves agencies outside of

USCIS's control, such as the FBI, and is crucial for the integrity of the immigration laws and the

safety of the United States. These background checks are designed to prevent granting benefits

to aliens who are ineligible due to criminal history, immigration fraud, or threat to national

security. Alkenani v. Barrows, 356 F.Supp.2d 652, 657 (N.D. Tex. 2005) ("Nor does the

immigration service have authority to expedite the FBI investigation or give petitioner priority

over background checks requested by other agencies. Unfortunately, delays of this nature are

inevitable and becoming more frequent in light of heightened security concerns in the post-911

13

world."). Furthermore, "judicial deference to the Executive Branch is especially appropriate in the immigration context." INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999). A mandamus action simply cannot be used to compel the performance of a discretionary act. Kale v. INS, 37 Fed. Appx. 90; 2002 WL 1022012 (C.A.5 (Tex.)) at *2 .

In sum, because USCIS's decision to continue evaluating Plaintiff's application lies within the discretion of the Attorney General under § 1255(a), this Court lacks subject matter jurisdiction over Plaintiff's claims. It is a well-established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government. See United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982); Mathews v. Diaz, 426 U.S. 67, 81 (1976) ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.").

Congress's specific withdrawal of subject matter jurisdiction from this Court defeats Plaintiff's assertion of general federal question jurisdiction under 28 U.S.C. § 1331 and mandamus jurisdiction under 28 U.S.C. § 1361. See Danilov v. Aguirre, 370 F.Supp.2d 441, 445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be relied upon to expand a very specific statute that either grants or limits jurisdiction."). Indeed, § 1252(a)(2)(B) expressly states that it applies "notwithstanding . . . [28 U.S.C. §] 1361," and the APA explicitly provides that it does not apply where "statutes preclude judicial review." 5 U.S.C. § 701(a)(2). Because the Court lacks subject matter jurisdiction over this action, Plaintiff's complaint should be dismissed in its entirety pursuant to Rule 12(b)(1).

14

2.      The Plaintiff's Request for Mandamus Under 28 U.S.C. §1361 Fails because the Defendant does not Owe a Clear, Nondiscretionary Duty to Process the Adjustment of Status Application Prior to Completion of Background Checks or at any Particular Pace.

Even assuming arguendo, that the jurisdiction stripping provisions of INA § 242 do not apply, the mandamus statute does not confer subject matter jurisdiction.  The Mandamus Act provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."  Heckler v. Ringer, 466 U.S. 602, 616 (1984).  Mandamus is available only when a government agent or agency has a duty to perform a specific act.  The duty must be plainly defined, non-discretionary, and free from doubt; the act must be purely ministerial.  Id.  An aggrieved party may not sue a federal agency when the agency action in question is committed to its discretion by law.  See 5 U.S.C. § 701(a)(2).

Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes."  Cheney v. United States District Court, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); accord Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980); Will v. United States, 389 U.S. 90, 95 (1967); Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 382-385 (1953).  See Kerr v. United States District Court, 426 U.S. 394, 402 (1976)( Mandamus relief is "a drastic one, to be invoked only in extraordinary situations."); see also, Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980); Giddings v. Chandler, 979 F.2d 1104, 1008 (5th Cir. 1992).  A writ of mandamus may only issue if three elements are met: "(1)

15

the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." In re First Federal Sav. & Loan Ass'n of Durham, 860 F.2d 135, 138 (4th Cir. 1988). Accord Rios v. Ziglar, 398 F.3d 1201, 1206 (10th Cir.2005); Nyaga v. Aschcroft, 323 F.3d 906, 911 (11th Cir. 2003).  As the Supreme Court has explained, the plaintiff's right to the relief sought must be "clear and indisputable," Allied Chemical, 449 U.S. at 35, and the defendant must owe the plaintiff "a clear non-discretionary duty."  Heckler v. Ringer, 466 U.S. at 616-17 (1984); see also In re First Federal Sav. & Loan, 860 F.2d at 138 ("Mandamus against a public official will not lie unless the alleged duty to act involves a mandatory or ministerial obligation which is so plainly prescribed as to be free of doubt.").

Here, Plaintiff lacks a clear right to immediate adjudication, and Defendant has no clear mandatory or ministerial obligation to adjudicate the application within a particular time frame. Safadi v. Howard, 466 F.Supp.2d at 700. The decision whether to grant or deny Plaintiff's adjustment application is plainly discretionary by statute.  See 8 U.S.C. § 1255(a).  Surely, part of USCIS's discretion in adjudicating an adjustment application includes ensuring that immigration benefits are not conferred to an alien ineligible for a benefit due to fraud, criminal convictions, or national security matters, and determining when the background checks are satisfactorily complete.  Accordingly, there are no statutory provisions or regulations that mandate the adjudication of adjustment applications within a particular time frame. Consequently, USCIS has no clear, mandatory duty to adjudicate Plaintiff's application prior to completion of background checks in order to meet a prescribed deadline.

For these reasons, district courts have routinely found that mandamus relief is unavailable to compel immediate adjudication of applications for adjustment of status.  Safadi v.

16

<u>Howard</u>, 466 F.Supp.2d at 700; <u>Saleh v. Ridge</u>, 367 F.Supp.2d 508, 511 (S.D.N.Y. 2005) ("The Court therefore lacks subject matter jurisdiction to compel agency action by writ of mandamus in this case."); <u>Karan v. McElroy</u>, No. 02 Civ. 6678(JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003) ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the mandamus statute. . . to grant the relief the plaintiff seeks."); <u>Zheng v. Reno</u>, 166 F.Supp.2d 875, 880-81 (S.D.N.Y. 2001); <u>Sadowski v. INS</u>, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000); see also <u>Rahman v. McElroy</u>, 884 F.Supp. 782, 787 (S.D.N.Y. 1995).  As the district court in <u>Saleh</u> noted, "[a]djustment of immigration status . . . is a discretionary act, and therefore, [i]n keeping with the plain language [of 8 U.S.C. § 1255(a)], courts have consistently found mandamus inappropriate in actions based on the government's failure to adjust an applicant's status." <u>Saleh</u>, 367 F.Supp.2d at 508 (brackets original, internal quotation marks omitted).

 In sum, because the timing of the adjudication of Plaintiff's adjustment of status application is not "subject to positive command, plainly described and free from doubt," Plaintiff is not entitled to the extraordinary relief of mandamus.  <u>Rahman</u>, 884 F.Supp. at 787.  The Court thus lacks subject matter jurisdiction to issue the writ.

### 3.    <u>The APA Precludes This Court From Reviewing Plaintiff's Claim Because it Concerns Action that is Committed to Agency Discretion.</u>

The APA does not, however, entitle a person "adversely affected or aggrieved by agency action" to judicial review, see § 702, where another statute precludes judicial review or "agency action is committed to agency discretion by law."  See § 701(a)(2); <u>Brock v. Pierce County</u>, 476 U.S. 253, 260 n.7 (1986).  "The principle purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived—is to protect agencies

from undue judicial interference with his lawful discretion . . . ." <u>Norton v. So. Utah Wilderness</u> <u>Alliance</u>, 542 U.S. 55, 66 (2004). Here, § 701(a)(2) precludes judicial review over Plaintiff's claims because the adjudication of I-485 adjustment applications is committed to agency discretion. <u>See</u> <u>Safadi v. Howard</u>, 466 F.Supp.2d at 700.

The APA itself does not confer jurisdiction on a district court to review the decision of an administrative agency. <u>Califano v. Sanders</u>, 430 U.S. 99, 107 (1977). However, a district court may have subject matter jurisdiction under 28 U.S.C. § 1331 over a claim that an agency has violated the APA, if the claim is not "wholly insubstantial and frivolous" or "patently without merit." <u>Bell v. Hood</u>, 327 U.S. 678, 682-84 (1946).

Even where subject matter jurisdiction to review an APA claim exists, however, a claim is nevertheless unreviewable by the courts if the relevant agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "Agency action" is defined under the APA to include a "failure to act." 5 U.S.C. § 551(13). In <u>Heckler v. Chaney</u>, <u>supra</u>, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no meaningful standard against which to judge the agency's exercise of discretion." <u>Id.</u> at 830. As the Court went on to explain, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" <u>Id.</u>; <u>see also</u> <u>Collins Music</u> <u>Co. v. United States</u>, 21 F.3d 1330, 1335 (4th Cir. 1994).

As explained above, the adjudication of an adjustment of status application is expressly committed to agency discretion. <u>See</u> 8 U.S.C. § 1255(a) (an alien's status "may be adjusted by the Attorney General, <u>in his discretion</u> and under such regulations as he may prescribe") (emphasis added). Moreover, no statutory or regulatory provisions provide a "meaningful

standard" against which to measure USCIS's process of adjudicating such an application. Heckler, 470 U.S. at 830.  Rather, the agency maintains complete discretion to determine, not only whether to adjudicate the adjustment application, but also "how and when" to do so.  Id.  In contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b) (requiring adjudication of naturalization applications 120 days after examination), the statute and regulations governing Plaintiff's adjustment of status application provide no time frame for when such an application must be adjudicated.  See Zheng v. Reno, 166 F.Supp.2d at 879 ("[T]here is no requirement that the application be decided within a specific period of time[.]").  Consequently, there is no standard against which the Court can measure whether the Agency has acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, id. § 706(1).

In the absence of a specified time frame for adjudication, other courts have found that claims relating to alleged delays in the process of adjudicating an adjustment of status application are unreviewable under the APA.  See Zheng, 166 F.Supp.2d at 878-89; Karan v. McElroy, supra, at *1 ("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff seeks."); see also Rahman v. McElroy, 884 F.Supp. at 787-88.   In addition, at least two Supreme Court cases suggest the importance of a specified time period in allowing a court to compel agency action that is "unreasonably delayed" under § 706(1).  See Norton v. Southern Utah Wilderness Alliance, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time period . . . a court can compel the agency to act . . . ."); Brock v. Pierce County, 476 U.S. at 260 n.7 (finding that because "the statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's

19

discretion, . . . [t]he court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

Without any mandatory time frame to adjudicate Plaintiff's claim that USCIS has "improperly withheld action," Complaint at ¶ 1, and "unreasonably delayed," adjudication of his application, this Court would have to create a temporal standard out of whole cloth.  This is a perilous task given the national security considerations that affect USCIS's adjudicative process. Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies.'"  Rahman, 884 F.Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler v. Chaney, 470 U.S. at 831-82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities").  Accordingly, the Court should find that 8 U.S.C. § 701(a)(2) precludes review of the agency's adjudicative process, because it is committed to agency discretion by law.

Moreover, Plaintiff has available administrative remedies to seek redress if the application is denied.  As federal regulations make clear: "[n]o appeal lies from the denial of an application by the director, but the applicant, if not an arriving alien, retains the right to renew his or her application in proceedings under 8 C.F.R. § 245.2(a)(1) [i.e., removal proceedings]." 8 C.F.R. § 245.2(a)(5)(ii).  See also AUSTIN T. FRAGOMEN, JR., ET AL., IMMIGRATION PROCEDURES HANDBOOK 13-91 (1999) ("There is no direct appeal from [an adjustment of status] denial. . . . If the alien believes that the adjustment application was wrongly denied, he or she has the right to reapply for adjustment of status as a part of deportation proceedings brought

20

against him or her by the INS [and thereafter the] alien has a right to appeal the denial of an adjustment application when . . . made during a removal proceeding.").

Even if 5 U.S.C. § 555(b) (requiring agency action within a reasonable time) can be construed as a statute that renders Defendants' actions reviewable under § 1331, the Complaint is devoid of factual allegations that demonstrate unreasonable delay in acting upon Plaintiff's application.  See Uckan v. Chertoff, No. 3:05-CV-2502-P (N.D. Tex. December 19, 2006) (holding that four years is not an unreasonable delay for a pending naturalization application awaiting completion of a background check); Safadi v. Howard, supra at 700-01 (nearly four year delay was not so unreasonable as to be tantamount to a refusal to process the application); Jabr v. Chertoff, 2006 WL 3392504 (E.D. Mo. Nov. 21, 2006)(more than two years since adjustment application filed).  While Plaintiff would like immediate adjudication of the application, there is no statutory support warranting such relief.  Therefore, should the Court find that 5 U.S.C. §555(b) confers subject matter jurisdiction over this matter, dismissal is proper for failure to state a claim under Rule 12(b)(6).

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss this case for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and/or for failure to state a claim pursuant to Rule 12(b)(6).

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____

21

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____

HEATHER GRAHAM-OLIVER
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
202-514-6531

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Alexi Orlov,                                    )
                        Petitioner,             )
                                                )
                                                )
            v.                                  )        Case No. 1:07 cv 350
                                                )
Michael Chertoff,                               )
Secretary of the Department of                  )
U.S. Homeland Security, *et al.,*               )
                        Defendants.             )
                                                )
_____                 )


## DECLARATION OF SUSAN P. DIBBINS


        Pursuant to 28 U.S.C. § 1746, Susan P. Dibbins declares under penalty of perjury

as follows:

    I, Susan P. Dibbins, hereby declare:

    I am the Field Office Director of the Washington District Office, located in Fairfax,

Virginia, of the United States Citizenship and Immigration Services (USCIS) in the

Department of Homeland Security (DHS).  I oversee the adjudication of applications for

immigration benefits, including applications for adjustment of status.  I held the position

of Assistant District Director from September 2004 until April 1, 2007, when I was

promoted to the position of Field Office Director.   In those capacities, and based upon

reasonable inquiry and my knowledge, information and belief, I state the following:


        (1)     When an alien applies for adjustment of status, USCIS conducts several

forms of security and background checks to ensure that the alien is eligible for the benefit

and that he or she is not a risk to national security or public safety.  In addition to record

checks against DHS's own immigration systems, these background checks currently

include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal

1

history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity. No immigration benefit (e.g., adjustment of status, naturalization/U.S. citizenship) is granted unless and until all the above-required background checks have been completed and resolved.

(2)    These law enforcement checks can reveal significant derogatory information concerning alien applicants for immigration benefits, including applicants seeking adjustment of status. Such checks have resulted in alien applicants being found ineligible for the benefit sought, and in the USCIS's denial of the application. In some instances, the disqualifying information concerning the alien has been discovered as a result of the IBIS or FBI name checks, when it had not been revealed by a fingerprint check alone.

(3)    If a background or security check reveals verified derogatory information on the alien (i.e., a positive result), the USCIS works with other divisions of DHS and other law enforcement and intelligence agencies, as necessary, to obtain all available information concerning the derogatory record. Depending on the information, DHS/ICE may place the alien in immigration proceedings to remove him or her from the United States.

(4)    Although an alien's file may show that an FBI fingerprint check was performed, the fingerprint checks frequently do not reveal the types of derogatory information described above, particularly when it is not information that has resulted in an arrest or criminal conviction. For example, persons on a "watch list" who are suspected of terrorist activity will not necessarily be identified through an FBI fingerprint check, but could be identified through an IBIS record check or an FBI name check of investigation databases.

(5)    It would be unconscionable and potentially risk the safety and security of the nation for USCIS to grant United States lawful permanent resident status to anyone without first ensuring that the government's law enforcement databases do not contain verified derogatory information about the alien.  With lawful permanent resident status, a person who is a risk to the public or the nation's security could obtain work in sensitive industries and travel on transportation carriers more easily.

(6)    The applicant, Alexei G. Orlov, A72-201-860, filed his form I-485, Application to Register Permanent Residence or Adjust Status on February 27, 2003.  A notice in the file indicates that the applicant requested a change of interview location from Roanoke, Virginia to Arlington, Virginia on October 6, 2003.  There is also an appointment notice in the applicant's file that indicates an interview on the form I-485 application was scheduled for July 28, 2005.  A request for additional documents was also mailed to the applicant on July 21, 2005, with a deadline for submission of August 20, 2005.  The documents were received by USCIS, and are postmarked July 26, 2005.

(7)    The applicant's adjustment application is based upon a form I-130, petition for alien relative, which was filed on his behalf by his United States Citizen wife at the same time as the form I-485, on February 27, 2003.  The form I-130 was approved at the Washington District Office of USCIS on September 7, 2005.

(8)    FBI name checks were initiated on the applicant on or around May 5, 2003.  USCIS has not yet received the results of the name check from the FBI as of today's date.  A request to expedite this name check has not been filed with the FBI. Expedite requests require additional fees to be paid to the FBI by USCIS and USCIS is limited by the FBI as to the number of requests that can be made.  Therefore, such requests are only made in exceptional circumstances.  On February 20, 2007 USCIS posted a clarification of the criteria used to expedite FBI name checks on its public website.  This clarification made clear that pending litigation was removed as the sole basis to support an expedite request.  USCIS may continue to request an expedited FBI name check for a case in litigation if it meets one of several other approved criteria, including, but not limited to:  1.  Military deployment;  2.  Age-out cases not covered under the Child Status Protection Act, and applications affected by sunset provisions such as diversity visas; 3.  Significant and compelling reasons, such as critical medical

3

conditions, and 4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

(9)    FBI fingerprint checks of the applicant were submitted to the FBI on May 7, 2003.  USCIS received the results of that fingerprint check from the FBI on May 8, 2003.  These fingerprints checks expired on August 8, 2004, and a second set of fingerprints was submitted to the FBI on December 14, 2004.  The second set of fingerprints expired on March 14, 2006.  A third set of fingerprints was processed by the FBI on March 1, 2006 and are set to expire on June 1, 2007.   In the event this case is not completed by June 1, 2007, a new fingerprint notice will be mailed to the applicant to once again update his fingerprints to be current to within 15 months.

(10)    IBIS checks were initiated on the applicant on July 20, 2005, and again on May 1, 2007, and have been concluded.

(11)    In consideration of these security checks, there are issues requiring further inquiry by USCIS to determine the applicant's eligibility for lawful permanent residence status.  Specifically, USCIS is still waiting for the results of the original name check from May 5, 2003 to be submitted by the FBI to USCIS for review.

(12)    Upon receipt and analysis of the results of the pending security check, USCIS will continue to review Mr. Orlov's adjustment application and complete its adjudication as expeditiously as possible under the circumstances.


I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.  Executed on this third day of May, 2007.


_____
Susan P. Dibbins
Field Office Director
Fairfax, Virginia Office
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALEXI G. ORLOV,

       Plaintiff,

       v.

PHYLLIS A. HOWARD,
       et al.,

       Defendants.

Case No:
1:07CV00350

## <u>DECLARATION OF MICHAEL A. CANNON</u>

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for ALEXI G. ORLOV, the plaintiff in this civil action.

## <u>NATIONAL NAME CHECK PROGRAM</u>

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

1    police and intelligence agencies, and state and local criminal justice agencies. The Central

2    Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.

3    The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower

4    Administration. That executive order addresses personnel security issues and mandates National

5    Agency Checks as part of the pre-employment vetting and background investigation process for

6    prospective Government employees. The FBI performs the primary National Agency Check

7    conducted on all United States Government employees. From this modest beginning, the

8    Program has grown exponentially, with more and more customers seeking background

9    information from FBI files on individuals before bestowing a privilege, such as Government

10    employment or an appointment, a security clearance, attendance at a White House function, a

11    "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and

12    local agencies regularly request FBI name searches. In addition to serving our regular

13    Government customers, the FBI conducts numerous name searches in direct support of the FBI's

14    counterintelligence, counterterrorism, and homeland security efforts.

15    **EXPLANATION OF THE CENTRAL RECORDS SYSTEM**

16       (5)  The FBI's CRS enables the FBI to maintain all information which it has

17    acquired in the course of fulfilling mandated law enforcement responsibilities. The records

18    maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

19    compiled for law enforcement purposes. This system consists of a numerical sequence of files

20    broken down according to subject matter. The subject matter of a file may relate to an

21    individual, organization, company, publication, activity, or foreign intelligence matter. Certain

22    records in the system are maintained at FBI Headquarters. Records which are pertinent to

23    specific FBI Field Offices are mostly maintained at those Field Offices.

24       (6)  FBI Headquarters and each Field Division can access the CRS through the

25    FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

26    indices on various subjects, including the names of individuals and organizations. Only the

27    information considered pertinent, relevant, or essential for future retrieval is indexed.

28

1           (7)    Communications directed to FBI Headquarters from various Field Offices

2    and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

3    groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

4    victims. Searches made in the index to locate records concerning particular subjects are made by

5    searching the name of the subject requested in the index.

6           (8)    The entries in the General Indices fall into two categories:

7              (a)    "main" entries – entries that carry the name corresponding
    with the subject of a file contained in the CRS.

8

9              (b)    "reference" entries – entries (sometimes called "cross-
references") that generally only mention or reference an
individual, organization, etc., that is contained in a

10       document located in another "main" file.

11          (9)    In 1995, the FBI implemented the Automated Case Support ("ACS")

12   system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records

13   were converted from automated systems previously utilized by the FBI. The ACS system

14   consists of the following three automated applications that support case management functions

15   for all investigative and administrative cases:

16             (a)    Investigative Case Management: This application provides
the ability to open, assign, and close investigative and

17   administrative cases as well as to set, assign, and track
leads. A case is opened by the Office of Origin, which sets

18   leads for itself and other field offices, as needed. The
offices that receive the leads are referred to as Lead Offices.

19   When a case is opened, it is assigned a Universal Case File
Number, which is utilized by FBI Headquarters and all

20   offices conducting or assisting in the investigation. Using
fictitious file number "111-HQ-12345" as an example, an

21   explanation of the Universal Case File Number is as
follows: "111" indicates the classification for that specific

22   type of investigation; "HQ" is the abbreviated form used for
the Office of Origin of the investigation (in this case, FBI

23   Headquarters); and "12345" indicates the individual case
file number for that particular investigation.

24

25             (b)    Electronic Case File: This application serves as the central
electronic repository for the FBI's official text-based
documents. It supports the universal serial concept, where

26   only the creator of a document serializes it into a file,
providing single source entry of serials into the

27

28                         3

computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.4 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

4

1    reasons to explain why an FBI Special Agent conducting an investigation believed it important to

2    include a particular name in the FBI's index for later recovery. The names are searched in a

3    multitude of combinations, switching the order of first, last, and middle names, as well as

4    combinations with only the first and last names, first and middle names, and so on. The Program

5    application searches names phonetically against the Universal Index records and retrieves similar

6    spelling variations (which is especially important considering that many names in our indices

7    have been transliterated from a language other than English).

8            (12)    If there is a match with a name in a FBI record, it is designated as a "Hit,"

9    meaning that the system has stopped on a possible match with the name being checked. If a

10   search comes up with a match to a name and either a birth date or social security number, it is

11   designated an "Ident."

12   <center>**RESOLUTION RATE**</center>

13           (13)    Historically, approximately 68 percent of the name checks submitted by

14   USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72

15   hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable

16   information regarding a particular individual. Duplicate submissions (i.e., identically spelled

17   names with identical dates of birth and other identical information submitted while the original

18   submission is still pending) are not checked, and the duplicate findings are returned to USCIS

19   within 48-72 hours.

20           (14)    For the name check requests that are still pending after the initial

21   electronic check, additional review is required. A secondary manual name search completed

22   typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests

23   as having "No Record," for a 90 percent overall "No Record" response rate. The results of this

24   22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being

25   the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the

26   record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can

27   be reviewed quickly. If not, however, the relevant information must be retrieved from an

28

<center>5</center>

1  existing paper record. Review of this information will determine whether the information is
2  identified with the request. If the information is not identified with the request, the request is
3  closed as a "No Record" and USCIS is so notified.

4        (15)   Once a record is retrieved, the FBI reviews the file for possible derogatory
5  information. Less than one percent of USCIS's requests are identified with a file containing
6  possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory
7  information to USCIS.

8  ## GROWTH OF THE NAME CHECK PROGRAM

9        (16)   Prior to September 11, 2001, the FBI processed approximately 2.5 million
10  name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the
11  number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4
12  million name checks.

13  ## USCIS NAME CHECK REQUESTS

14        (17)   In November 2002, heightened national security concerns prompted a
15  review of the former Immigration and Naturalization Service's ("INS's") procedures for
16  investigating the backgrounds of individuals seeking immigration benefits. It was determined
17  that deeper, more detailed clearance procedures were required to protect the people and the
18  interests of the United States effectively. One of the procedures identified was the FBI's name
19  check clearance. Before November 2002, only those "main" files that could be positively
20  identified with an individual were considered responsive to the immigration authorities name
21  check requests. However, because that approach ran a risk of missing a match to a possible
22  derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a
23  processing standpoint, this meant the FBI was required to review many more files in response to
24  each individual background check request.

25        (18)   In December of 2002 and January of 2003, the former INS resubmitted 2.7
26  million name check requests to the FBI for background investigations of all individuals with
27  then-pending applications for immigrations benefits for which the Immigration and Nationality

28

1    Act required background investigations. Those 2.7 million requests were in addition to the

2    regular submissions by the former INS. Currently, the FBI has returned an initial response to all

3    2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to

4    those resubmitted requests indicated that the FBI had no information relating to the specific

5    individual who was the subject of the request, approximately 16 percent – or over 440,000 –

6    resubmitted requests indicated that the FBI may have information relating to the subject of the

7    inquiry. The FBI is still in the process of resolving those 440,000 requests.

8            (19)    The FBI's processing of those 440,000 resubmissions has delayed the

9    processing of regular submissions from USCIS. As directed by USCIS, the FBI processes name

10   check requests on a "first-in, first-out" basis unless USCIS directs that a particular name check

11   be expedited.

12           (20)    The FBI cannot provide a specific or general time frame for completing

13   any particular name check submitted by USCIS. The processing of name checks, including those

14   which are expedited, depends upon a number of factors, including where in the processing queue

15   the name check lies; the workload of the analyst processing the name check; the volume of

16   priority checks the analyst must process for, among others, military call-ups, medical

17   emergencies, "age-outs," or immigration "lottery" winners; the number of "Hits," (i.e., possible

18   matches) that must be retrieved, reviewed and resolved; the number of records from various Field

19   Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and

20   resources available to conduct the checks. While the FBI is sensitive to the impact of the delays

21   in processing name check requests, the consequence of the FBI's mission on homeland security

22   requires that its name check process be primarily focused on providing accurate and thorough

23   results. When the name check is completed, the FBI provides the results to USCIS as quickly as

24   possible.

25           (21)    It is important to note that the FBI does not adjudicate applications for

26   benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a

27   summary of available information to USCIS for its adjudication process.

28

7

1

## PLAINTIFF'S NAME CHECK REQUEST

2         (22)    The name check request for plaintiff ALEXI G. ORLOV was received by

3   the FBI from USCIS on or about May 8, 2003, and has not been completed. The FBI is

4   performing its check in response to USCIS's request in accordance with procedures outlined

5   above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due

6   course, in accordance with the FBI's normal protocol.

7         (23)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

8   foregoing is true and correct to the best of my knowledge and belief.

9         Executed this __4th__ day of May 2007.

10

11

                MICHAEL A. CANNON

12                Section Chief

                National Name Check Program Section

13                Records Management Division

                Federal Bureau of Investigation

14                Washington, D.C.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALEXEI ORLOV,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 07-0350 (JDB)** |
| **PHYLLIS A. HOWARD, et al.** | ) |
| **U.S. Citizenship and Immigration Services** | ) |
| | ) |
| **Defendants.** | ) |

## <u>ORDER</u>

**ORDERED** that Defendants' dispositive Motion should be and hereby is GRANTED;

and it is further

**ORDERED** that this case should be and hereby is DISMISSED with prejudice from the

Court's docket.

 

 

_____
UNITED STATES DISTRICT JUDGE